*Sealed*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: GRAND JURY SUBPOENA DATED MARCH 20, 2013 | UNDER SEAL |
| | 13-Mc-189 (Part I) |
| | <u>OPINION & ORDER</u> |

SIDNEY H. STEIN, U.S. District Judge.

John Doe, the subject of a grand jury investigation convened by the U.S. Attorney's Office for the Southern District of New York, has moved to intervene in order to quash a grand jury subpoena served on an investigator who had previously assisted in his defense. Doe also seeks the return of a file kept by the investigator that she provided to government agents during an interview conducted at her apartment. Following a three-day fact-finding hearing concerning Doe's motion, Doe's motion to quash is granted in part and denied in part for the reasons set forth below.[1]

I.  **BACKGROUND**

A.  **The Retention of Investigator**

Late one night in early 2009, a young woman died of a cocaine overdose following a tryst at an upscale Manhattan hotel. (Def. Ex. F; Hr'g Tr. 203:14–23.) In the hotel room with that woman, whom the Court will refer to as "Decedent," were two other people—John Doe and Jane Roe. Within a week of Decedent's death, John Doe had retained a veteran criminal defense attorney ("Lawyer") to represent him in the face of any anticipated prosecution. (Def. Ex. A; Hr'g Tr. 35:24–25.) One of the first things Lawyer did was retain a firm of third-party investigators, primarily to interview witnesses. (Def. Ex. A; Hr'g Tr. 10:13–12:3.) That firm prepared a letter confirming that the firm was working for Lawyer "in

---

[1] The government does not oppose Doe's motion to intervene.

connection with [Lawyer's] representation of" John Doe. (Def. Ex. A at 1.) The firm gave Lawyer written reports of its progress. (Hr'g Tr. 12:4–7.) However, Lawyer did not himself pay the firm for its services. (*Id.* 11:18–20.)

Two years passed. By early 2011, Lawyer and John Doe were aware that Doe was the target of an ongoing criminal investigation by the U.S. Attorney's office for the Southern District of New York. (*Id.* 40:8–41:6.) Despite the passage of time, there were still witnesses that Lawyer's investigators had not interviewed. (*Id.* 14:7.) These witnesses were women, so Lawyer figured that they "might be able to relate better with another woman" rather than Lawyer's stable of male investigators. (*Id.* 14:9–10.)

With these thoughts in mind, Lawyer reached out to a female investigator ("Investigator") with whom Lawyer had been in contact for several months. (Hr'g Tr. 13:19–24; Gov't Ex. 11.) On April 1, 2011, Lawyer and Investigator met at Lawyer's office. (Hr'g Tr. 21:15–16, 57:5–24; Def. Ex. C at 4.) Lawyer "explained the nature of the case to [Investigator], asked her that [he would] like her to participate in the matter, and indicated to her that . . . a meeting with some of the attorneys [was taking place] tomorrow . . . and would like her to attend for the purpose of meeting the client and meeting the other attorneys." (Hr'g Tr. 14:16–21.) Lawyer admits that he did not retain Investigator at the April 1 meeting. (*Id.* 21:19.) Lawyer explained that he wanted to "get everybody's approval" before retaining Investigator. (*Id.* 21:20–21.)

On April 2, 2011, John Doe and his defense team met at an office in Westchester County. (Gov't Ex. 3 ¶ 3.) Prior to this meeting, Lawyer had informed another of Doe's attorneys—a partner at a large New York law firm—that Lawyer "had used [Investigator] as an investigator on prior cases and had brought her in to assist him" representing Doe. (*Id.*) Investigator sat in as Doe and his battery of attorneys discussed his legal defense strategy. (Def. Ex. D ¶ 8.)

The April 2 meeting was the first time that Doe and Investigator met. (Hr'g Tr. 58:6–7.) Lawyer testified that he retained Investigator on the day of this meeting. (*Id.* 21:22–23.) Investigator testified that during the meeting, Lawyer told Doe that Investigator's retainer was $5,000, and that Doe paid Investigator approximately $500 cash at that time. (*Id.* 101:8–102:8.)

Approximately six weeks after Investigator began working on the Doe matter, Doe executed a contract, authorizing Investigator's company (of which she was the sole member) "to conduct a full investigation as follows;

Witness location/interviews

Take witness statements and conduct background and criminal history inquiries. Analysis of previously compiled data. Prepare written reports for the Law Offices of [Lawyer]. Provide court testimony if required.

I [John Doe] have hereby retained the services of [Investigator's company] under the following terms and conditions . . . .

(Gov't Ex. 7 at 1.) Those terms and conditions listed Investigator's retainer as $5,000 and her hourly fee as $100. (*Id.*) John Doe and Investigator each executed this contract on May 13, 2011. (*Id.* at 3.)

### B.   Investigator's Work on the Doe Case

After the April 2 meeting, Investigator began working on the Doe matter. (Hr'g Tr. 63:1–3.) Investigator's duties chiefly involved witness interviews. Lawyer testified that he told Investigator whom to interview, including a woman who came to the hotel the night of Decedent's death, another woman who was present, and the limousine driver who took Jane Roe away from the hotel after Decedent had collapsed. (Hr'g Tr. 45:16–46:4.) Investigator also testified that Lawyer, not John Doe, told investigator whom to interview. (*Id.* 98:16–20.) Lawyer testified that Investigator never prepared written reports, memos, nor indeed any written documents for Lawyer. (*Id.* 29:25–30:3, 34:23–25.) This conflicts

3

with Investigator's testimony—that she provided Lawyer with written reports following each of her interviews. (*Id.* 109:20–110:21.) However, Investigator did come to Lawyer's office in person to discuss the case. (*Id.* 34:25–35:8, 60:18–20, 66:24–67:1, 97:10–14, 105:18–21.) Investigator "told [Lawyer] who she saw, what she did, how difficult it was to see a particular witness or how easy it was." (*Id.* 35:2–3.)

Lawyer did not pay Investigator—apparently Lawyer's "normal practice." (*Id.* 36:4, 64:13–18.) Rather, John Doe paid Investigator in cash. (*Id.* 102:21–25.) Investigator's billing system was erratic at best. (*Id.* 94:9–96:2.) Somehow, Investigator would make known to John Doe the amount he owed and they would meet in person for Doe to pay Investigator in cash. Often, these meetings took place in Doe's car as he drove the streets of Manhattan. (*Id.* 103:3–15.) Sometimes, Investigator would contact John Doe's sister in order to secure payment from Doe. (*Id.* 106:9–107:1.) All told, John Doe paid Investigator approximately $12,000 for her work on the case. (*Id.* 102:14–103:2.)

Investigator was also in a great deal of phone contact with both Doe and Lawyer. Between April and August 2011, Investigator's two phones reported 157 "contacts" with the cell phone registered to John Doe. (*Id.* 321:6–10.) In 2011, Investigator's phones reflected 63 "contacts" with Lawyer. (*Id.* 322:19–323:3.) Investigator's phones also reflected 41 "contacts" with a phone registered to Doe's sister. (*Id.* 323:4–7.) "Contacts" encompasses both text messages and voice communications. (*Id.* 319:16–21, 321:24–25.)

## C.   Meetings with Jane Roe

Two incidents that took place during Investigator's work on the Doe matter deserve special attention. Each involved Jane Roe—the third person in the hotel room the night of Decedent's death who was a key witness Lawyer wanted Investigator to interview. (*Id.* 57:20–24.)

The first incident took place in early April 2011, just a few days after Investigator began work on the Doe case. Jane Roe had been subpoenaed to testify before a grand jury in the Southern District of New York. (Gov't Ex. 1 at 105–07.) In advance of her testimony, John Doe had hired an attorney to represent Roe. (Hr'g Tr. 206:2–5.) (The Court will refer to this lawyer as "Roe's attorney.") The night before Roe was due to testify, Roe's attorney came to her house to help her prepare. Unbeknownst to him, his conversation with Roe was recorded.

Roe's attorney coached Roe on what to say in order to make the case "go away." (Gov't Ex. 2T at 8.) Following the incident when Decedent died, Roe had given the New York police a detailed statement describing what had happened that night. (Def. Ex. F.) Roe's attorney recommended that Roe contradict this statement: for example, "if they ask you if you saw [John Doe] with drugs, tell 'em you'd been drinking n' you did not see [Doe] with drugs. (UI) not sure what you saw. If [the prosecutors] read you your statement, you say 'well that's not what I saw.' If you say these things, the case will go away." (Gov't Ex. 2T at 13.) Roe's attorney suggested that Roe explain away her statement to police by claiming that she signed it simply in order to go home after 16 hours in custody. (*Id.* at 17.)

In addition to his unethical and criminal coaching, Roe's attorney told Roe that John Doe wanted "to send to his, his lawyer's investigator here to take a statement from ya tonight." (*Id.* at 6.) Roe's attorney asked if Roe had "any objection to being interviewed by [Doe's] lawyer's investigator, having her write down what you just said, and signing it? I don't, there's not ramifications for you. But it, it gives [Doe], um, a lot of peace of mind." (*Id.* at 16.) Roe's attorney described this investigator multiple times—each time as working for Doe's lawyer. (*Id.* at 6, 7, 16, 17, 18, 20.) Roe, however, refused to speak with the investigator. (*Id.* at 22.) Roe's attorney called the investigator and told her not to come to Roe's house. (*Id.* at 23.)

The investigator Roe's attorney spoke of was Investigator, who testified before this Court. Investigator testified that Roe's attorney left a voicemail, asking Investigator "[w]hat time are you coming to take the statement [from Roe]?" (Hr'g Tr. 142:7.) Investigator understood "taking a statement" to mean asking Roe questions, not "prepar[ing] a statement for that person to sign." (*Id.* 81:4–5.)

The second incident of note took place in early May 2011. (*Id.* 134:9.) Once again, Investigator was hoping to "take a statement" from Jane Roe. (*Id.* 134:16–18.) Investigator drove to John Doe's place of business, where she met Doe's sister. (*Id.* 134:16–19.) Together, they drove to an abandoned warehouse. (*Id.* 134:16–21, 135:25–136:7, 145:24–25.) Outside the warehouse, Investigator met Roe's attorney. (*Id.* 136:11–16.) Roe's attorney and Investigator went into the warehouse and waited in a small office. (*Id.* 137:1–12.) Some time later, John Doe entered the office with Jane Roe. (*Id.* 137:20–23.) Investigator testified that she then asked Doe to leave. (*Id.* 138:10–12.)

Roe's attorney presented Roe with a prepared statement and, for the next hour, pressured her to sign it. (*Id.* 138:13–139:7.) As Investigator testified:

> [Roe's attorney] explained to [Roe] that she needed to sign the paperwork. I [Investigator] sat there basically and observed. I noticed that, you know, [Roe] was reluctant to sign the paperwork. [Roe's attorney] was somewhat insistent. And [Roe], as a result of being uneasy about signing anything, she made a phone call. During that phone call, she expressed concern about signing this. Um, and I, you know, asked her, would it be possible for me to talk to her and take another statement as opposed to her signing this. And that wasn't an option for his client, as [Roe's attorney] stated. He wanted her to sign the document that was put in—for her to sign right there.

(*Id.* 138:21–139:7.) Investigator also testified that "obviously [Roe] was under duress" during this meeting. (*Id.* 145:16, 209:22–25.) Eventually, Jane

Roe signed the statement. (*Id.* 140:3–4.) Investigator took a copy (Roe's attorney had brought two) and the meeting adjourned. (*Id.* 140:5–16.)

### D. End of Investigator's Work for Doe

In August 2011, Investigator's work for John Doe ended following an argument with Doe in Lawyer's office. (*Id.* 167:14–17.) Lawyer had asked Investigator to interview Doe's girlfriend. (*Id.* 167:19–22.) Doe's girlfriend happened to be at the meeting in Lawyer's office, along with Doe, Doe's sister, and Lawyer. (*Id.* 168:15–17.) Investigator attempted to interview Doe's girlfriend, but Doe "came over and snatched [Investigator's] papers out of [her] hand and said a few not so flattering expletives to [her] and to" Doe's girlfriend. (*Id.* 168:25–169:2.) Due to this argument, Investigator stopped working on Doe's case. (*Id.* 170:2–10.)

### E. Investigator's Meeting with Government Agents

As a result of her testimony to the grand jury, Jane Roe was arrested, tried, and convicted on two counts of perjury and one count of false statement. Roe's attorney has also been arrested and indicted on one count of conspiracy to suborn perjury, one count of impeding a grand jury, and one count of witness tampering. In January 2014, he pled guilty to the conspiracy count and in April 2014 was sentenced principally to 48 months' imprisonment.

Following Jane Roe's trial a DEA agent, "Agent B," attempted to track down the investigator Roe's lawyer mentioned the night before Roe's grand jury testimony. (*Id.* 215:14–17.) By early February 2013, Agent B had located Investigator. (Gov't Ex. 3501-A at 1.) The night before Agent B planned on visiting Investigator, he e-mailed the Assistant U.S. Attorney handling this case and asked her to secure a grand jury subpoena. (*Id.*) Agent B noted that "[h]opefully I will not need it but will be great if she is uncooperative." (*Id.*) The AUSA signed a subpoena, compelling Investigator to appear before the grand jury on February 21, 2013 to testify concerning alleged witness tampering and impeding a grand jury. (Gov't

Ex. 4.) The subpoena did not require Investigator to produce documents. (*Id.*)

At approximately 5:30 p.m. the next day—February 11, 2013—Agent B went to Investigator's home in the Bronx. (Hr'g Tr. 132:20–23; 217:22–24.) With Agent B were two others, another DEA agent ("Agent F") and a Homeland Security special agent who worked in the same task force as Agent B. (*Id.* 218:10–23.) Agent B knocked on Investigator's door without reply. (*Id.* 133:4–5, 219:8–10.) He then telephoned Investigator, informed her of the agents' presence, and asked to come inside. (*Id.* 133:5–11, 219:10–17.) Investigator agreed. (*Id.* 133:18–21, 219:19–23.)

Once inside, Investigator and the agents spoke for over two hours about Investigator's personal affairs and about the John Doe case. (*Id.* 231:15–232:11, 335:23–337:7.) At some point during this conversation, Agent B served the grand jury subpoena on Investigator. Agent B and Agent F both testified that the subpoena was served within the first few minutes of their entry. (*Id.* 221:10–22, 336:7–13.) Investigator testified that she was not served until the end of the interview. (*Id.* 70:13–71:6.)

Investigator was unaware that Jane Roe had been convicted for her grand jury testimony and that Roe's attorney had been arrested. (*Id.* 158:15–18.) Once Investigator learned these facts, she became concerned that she could be a target of the government's investigation. (*Id.* 72:24–73:3.) However, Agent B and Agent F both testified that Investigator was explicitly told that she was not a target. (*Id.* 239:13–14, 261:18–262:11, 274:12–275:2, 353:20–354:9.) Nonetheless, Investigator "felt that if [she] didn't cooperate to some extent, then certain matters that were presented to [her] were not going to be cleared up." (*Id.* 72:2–4.) Investigator also testified that she was "on the defense and trying to clear things up, because [she] felt like [she] and [Lawyer] were being accused of doing something that was not the case." (*Id.* 74:1–3.)

In order to clear the air, Investigator told the agents a great deal about the attempted first meeting with Jane Roe, as well as the meeting in the

abandoned warehouse, and other communications with John Doe. Investigator played the voicemail that Roe's attorney left for Investigator the night of the attempted first meeting. (*Id.* 79:14–80:2.) Because of the particularities of her mobile phone's voicemail system, Investigator had needed to manually save that voicemail every 21 days in the two years between when it was left and her meeting with the government agents. (*Id.* 143:3–145:6.)

Agent B also asked Investigator if John Doe had ever paid a witness for favorable testimony. (*Id.* 227:24–228:2.) This question was prompted by an interview Agent B had previously conducted with a different (unnamed) witness. (*Id.* 228:3–6.) Investigator told the agents that during one meeting with John Doe, he suggested paying a reluctant witness "a bag of money." (*Id.* 69:17, 228:9–17.) Investigator testified that she believed Doe was joking, although she told him never to joke about such matters. (*Id.* 69:19–70:2, 228:18–24.)

At some point during the interview, conversation turned to the file that Investigator had kept concerning the Doe case. Investigator testified that the agents brought up the subject after seeing the file out on Investigator's table. (*Id.* 75:3–24.) Agent B testified that Investigator brought up the file as she tried to remember particular details about her work. (*Id.* 235:7–22.) In any event, Investigator handed over her file to Agent B, who told her that he would make a copy and return the original. (*Id.* 236:16–237:22, 346:17–347:8.)

Investigator also told the agents that about a year after she stopped working on the Doe matter, Investigator had provided a copy of at least a portion of the file to John Doe's sister so that she could pass it along to a new lawyer or investigator. (*Id.* 233:20–234:13.) Agent B and Agent F testified that Investigator told him that she had given Doe's sister a copy of the entire file. (*Id.* 234:9–13, 345:1–16.) Investigator testified that she gave Doe's sister just two pages of issues for further investigation. (*Id.* 165:3–

167:13.) Obviously, Investigator had retained a copy of the Doe file. (*Id.* 111:6–18.)

At the fact hearing, Investigator testified that she was concerned during the February 11 meeting that she was revealing privileged information. (*Id.* 71:16–72:11, 73:19–22.) Investigator stated that Agent B told her "that he had looked into it and [the attorney-client privilege] didn't apply to" Investigator. (*Id.* 74:23–24.) Agent B and Agent F both testified that Investigator never mentioned the issue of privilege. (*Id.* 233:12–18, 239:9–11, 348:19–21, 368:22–369:2.) Investigator did, however, tell agents that she was concerned about her relationship with Lawyer, who gave her a great deal of business. (*Id.* 76:15–25, 233:18–19.)

### F.   Post-Interview Steps

The day after this interview, Investigator told Lawyer that she had spoken with government agents and provided them with a copy of her case file. (*Id.* 149:9–12; Def. Ex. B1 ¶ 8.) That same day, Agent B contacted Investigator to arrange another interview, this time at the U.S. Attorney's office. (Hr'g Tr. 149:13–18, 243:22–244:4.) A meeting was scheduled for February 14, 2013, but on February 13, Investigator told Agent B that she would like an attorney to be present. (Gov't Ex. 3501-A at 6.) Investigator had at first wanted Lawyer's daughter, also an attorney, to attend the meeting. (Hr'g Tr. 149:22–150:1.) However, the Assistant U.S. Attorney spoke to Lawyer's daughter and decided that it would be inappropriate for Lawyer's daughter to attend the meeting. (*Id.* 150:2–5.) The meeting was adjourned several times as Investigator tried to secure a lawyer. (Gov't Ex. 3501-A at 10–16.)

Then, on February 28, 2013, Investigator called Agent B and told him that she had spoken with Lawyer "about her liability." (*Id.* at 17.) The next day, March 1, Lawyer contacted the U.S. Attorney's office for the first time concerning the February 11 meeting between Investigator and government agents and Investigator's upcoming meeting, then scheduled for March 4.

(Hr'g Tr. 201:6–15.) Lawyer left a voicemail "raising concerns that the planned [March 4] meeting might touch on areas protected by the attorney-client privilege." (*Id.* 201:13–15.) The government cancelled the March 4 meeting in light of Lawyer's concerns. (AUSA Decl. ¶ 6.)

On March 4, the AUSA and Lawyer spoke about his privilege concerns. (*Id.*) The AUSA told Lawyer that she "did not believe the privilege applied but that [she] was willing to allow [Lawyer] a reasonable period of time to determine whether [Lawyer] wished to move to quash the grand jury subpoena, and that in the meantime [the government] would refrain from scheduling any further meetings with [Investigator] or taking any investigative steps based on anything in [Investigator's] file." (*Id.* ¶ 6.) On approximately March 20, Lawyer contacted the AUSA and informed her that new counsel would be bringing a motion to quash on the grounds of privilege. (*Id.* ¶ 7.) The AUSA issued a new subpoena, dated March 20, 2013, compelling Investigator to give testimony to the grand jury on April 9, 2013. (Amarosa Aff. Ex. E.)

A week later, counsel representing John Doe contacted the government, seeking to reach an agreement to narrow the scope of Investigator's testimony to the grand jury. (AUSA Decl. ¶ 7.) The government proposed limiting Investigator's testimony to the circumstances of her retention, the attempted April 2011 meeting with Jane Roe, and the May 2011 abandoned warehouse meeting. (Amarosa Aff. Ex. D.) John Doe provisionally agreed, and Investigator's testimony was postponed until a final agreement could be executed. (AUSA Decl. ¶¶ 7–8.) However, on May 7, 2013, Doe's attorneys informed the government that the agreement was no longer acceptable. (*Id.* ¶ 7.) On May 31, 2013, John Doe filed the instant motion to intervene and to quash the grand jury subpoena.

## II.  DISCUSSION

John Doe's motion to quash only deals with privileged communications and protected work product—in other words, Investigator's file and communications between Doe and Investigator. Doe has not advanced a plausible claim to privilege to any other facts or communications, including, for example the events during the abandoned warehouse meeting.

The Court concludes that communications between Investigator and Doe are privileged pursuant to the so-called *Kovel* exception. However, the crime-fraud exception vitiates the privilege as to any communications concerning either the aborted meeting with Jane Roe in April 2011 or the abandoned warehouse meeting in May 2011. The Court further concludes that Doe waived any privilege or protection that might have applied to Investigator's file.

### A.  Communications Between John Doe and Investigator Are Covered by the Attorney-Client Privilege

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). "[C]ourts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Id.*

"Under certain circumstances . . . the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client." *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995). Thus, if a client communicates with a third party hired by the client's lawyer, that communication is privileged, so long as "the communication

[is] made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961).

The third party must fit within a certain class of professionals whose work "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* The archetypal examples of such professionals are interpreters and accountants. *See id.* Private investigators also fit within this category of necessary aides to the provision of legal services. *See Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 71 (S.D.N.Y. 2010); *see also U.S. Dep't of Educ. v. Nat'l Collegiate Athletic Ass'n*, 481 F.3d 936, 938 (7th Cir. 2007) (quoting *Kovel*, 296 F.2d at 922) ("[T]here is no private-investigator's privilege. [But] [t]he lawyer-client privilege can embrace a lawyer's agents (including an investigator), for example when the 'client in the first instance consults a lawyer who retains an accountant as a listening post.'"); *In re Grand Jury Proceeding*, 79 F. App'x 476, 477 (2d Cir. 2003) ("Under certain limited circumstances . . . the attorney-client privilege may extend to communications with a third party, such as an accountant or private investigator hired to assist in the rendition of legal services."). A contrary conclusion would force attorneys to forego the services of private investigators, lest their communications with the investigators ultimately be revealed at the business end of a subpoena. As Judge Friendly recognized in *Kovel*, the privilege must extend to encompass the realities of modern legal practice. *See Kovel*, 296 F.2d at 920–21.

But no matter how necessary a private investigator's services might be, communications between an investigator and a client outside the presence of an attorney can only be privileged if the attorney—not the client—retained the investigator.[2] *See id.* at 921. Thus, in this case, the application of the privilege to communications between John Doe and

---

[2] Communications between attorney and client in the presence of an investigator will remain privileged even if the client retained the investigator. *See Kovel*, 296 F.2d at 921.

Investigator depends on who hired Investigator—John Doe or Lawyer. The Court concludes that Doe has established, by a preponderance of the evidence, that Lawyer retained Investigator.[3]

"Establishment of an agency relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 225 (S.D.N.Y. 2013) (quotation marks, alterations, and citations omitted); *see also* Restatement (Second) of Agency § 1. Control by the principal of the agent is of "paramount" "importance" in determining if an agency relationship exists. *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 613, 2004 WL 112948, at *5 (S.D.N.Y. Jan. 22, 2004); *see also Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003). "Control is established when the principal prescribes what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times." *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 258 (S.D.N.Y. 2009) (quotation marks and alteration omitted).

The facts establish that Investigator was an agent of Lawyer and a subagent of John Doe. Lawyer testified that he—not John Doe—agreed with Investigator that she should act on Lawyer's behalf and subject to Lawyer's control. The government stipulated that a partner at a large New York law firm would testify that Lawyer informed the partner of Lawyer's relationship with Investigator prior to the April 2, 2011 meeting where Investigator first met John Doe. The Court credits Lawyer's testimony—corroborated by this stipulated testimony and Investigator's statements—that Lawyer was the one who "manifest[ed the] intent to grant authority to the agent." *Elbit*, 917 F. Supp. 2d at 225.

---

[3] The Court holds that the preponderance standard applies to determining whether an agent has been retained by a lawyer or a client. This issue is a "factual predicate[]" to the application of the *Kovel* exception. *United States v. James*, 712 F.3d 79, 105 (2d Cir. 2013).

The Court also finds that Investigator acted subject to Lawyer's primary control. The Court credits the testimony of Lawyer, bolstered by Investigator's testimony, that Lawyer told Investigator whom to interview, even when the interview subjects were distasteful to John Doe. The Court also credits Lawyer's testimony that he reaped the benefits of his directions to Investigator in the form of Investigator's reports to him.

The government opposes this conclusion based on three pieces of evidence: first, the contract between John Doe and Investigator's company; second, the fact that Doe paid Investigator directly for her services; and third, the number of contacts between Doe and Investigator. None of these facts alters the Court's holding.

First, the contract between Doe and Investigator simply confirms that Investigator was acting as a subagent, with Lawyer as her immediate principal and Doe as the ultimate principal. The contract makes clear that Lawyer would receive any work product that Investigator produced. The contract did not order that Investigator interview any specific witnesses— Lawyer gave those directions. The contract merely made clear that John Doe was the ultimate principal, even though Lawyer exercised direct control over Investigator's work. *See* Restatement (Third) of Agency § 3.15 illus. 3. In this way, the contract between Doe and Investigator parallels the *Kovel* letter sent by the firm of investigators Lawyer hired in 2009. That letter specifies that the firm was working for Lawyer "in connection with [his] representation of" Doe. (Def. Ex. A at 1.) That *Kovel* letter also demonstrates that Doe himself—as the ultimate principal—could exercise control over the investigative firm retained by Lawyer. Further, the letter envisaged communications directly between the investigative firm and Doe. Finally, the contract between Doe and Investigator was executed on May 13, 2011. (Gov't Ex. 7 at 3.) This date came more than a month after Investigator began work on the Doe case, and after both the aborted meeting with Jane Roe and the abandoned warehouse meeting. If Doe were controlling Investigator prior to the execution of this contract, he was

doing so pursuant to an unwritten agreement. But the Court only heard evidence concerning one unwritten agreement—the one between Lawyer and Investigator.

Second, the fact that Doe directly paid Investigator for her services does not alter the fact that Investigator worked directly for Lawyer. "The fact that [Doe] paid [Investigator] does not preclude a finding that [Investigator] acted as [Lawyer's] agent" in her work on the Doe case. *Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir. 1994). Even though Doe paid Investigator directly in cash, the record clearly demonstrates that Lawyer exercised day-to-day control over Investigator's work.

Third, the government focused on the voluminous contacts directly between Doe and Investigator between April and August 2011. Investigator testified that many of these contacts concerned the logistics of payment. She also testified that she would communicate with Doe directly to report on her progress. Once again, communications between Doe and Investigator do not take away from the Court's finding that Lawyer exercised control over Investigator's activities. And the entire point of the *Kovel* exception is to allow a client to communicate with a lawyer's agent without requiring that the lawyer also be present. *See Kovel*, 296 F.2d at 922.

In sum, the Court finds that Lawyer agreed that Investigator would act subject to his control on the Doe matter and that Lawyer exercised day-to-day control over Investigator's work. As such, Investigator was acting as Lawyer's agent, with John Doe as the ultimate principal. Therefore, the *Kovel* exception applies—communications between John Doe and Investigator for the purpose of obtaining legal advice from Lawyer are privileged.

### B.   The Crime-Fraud Exception Applies to Some Communications

Neither the attorney-client privilege nor the work product doctrine will shield communications made in furtherance of a crime or fraud. *See*

*Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 425–26 (S.D.N.Y. 2013); *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984). "This rule is aimed at serious misconduct and can be invoked only if [a party] demonstrate[s] that there is probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 259 F.R.D. 64, 73 (S.D.N.Y. 2009) (quotation marks and citations omitted). "The crime/fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity. The exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity." *In re Grand Jury Subpoenas Duces Tecum Dated Sept. 15, 1983*, 798 F.2d 32, 34 (2d Cir. 1986). It is not necessary that the person communicating with the client have knowledge that she is being used to carry out a crime or fraud. *See Amusement Indus., Inc.*, 293 F.R.D. at 440; *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1038.

The Court concludes that nonprivileged information establishes probable cause that John Doe was, at the least, attempting to tamper with the testimony of a witness, Jane Roe, in connection with a grand jury proceeding. *See* 18 U.S.C. § 1512(b)(1). Doe provided Roe with an attorney who then encouraged her to contradict her prior written statement when testifying before the grand jury. (Hr'g Tr. 206:2–5; Gov't Ex. 2T.) Investigator was twice sent to memorialize Roe's influenced recollection of the night of Decedent's death. Investigator herself believed that her attempted meeting with Roe and the abandoned warehouse meeting were inappropriate, hence her saving the voicemail left by Roe's attorney for nearly two years. (Hr'g Tr. 143:3–145:6.) In sum, there is probable cause to believe that any communications between John Doe and Investigator in connection with these two incidents—the April 2011 attempted meeting

with Roe and the May 2011 abandoned warehouse meeting—were made in furtherance of a crime.

However, the Court does not find probable cause to support a broader scheme of witness tampering—one that would encompass Doe's "bag of money" comment. The government agrees that the Court cannot use the "bag of money" comment to establish that the crime-fraud exception applies to this comment. (Gov't Mem. in Opp'n at 9 n.2.) Apart from this fact, the Court has only Agent B's testimony that another witness reported an attempt to influence testimony with cash. (Hr'g Tr. 228:3–6.) This single, vague piece of testimony does not establish probable cause to believe that Doe was engaged in a scheme that extended past Jane Roe.

## C.  Any Protection Covering Investigator's File Has Been Waived

At the February 11, 2013 meeting between Investigator and government agents, Investigator handed over a copy of the file she had kept on the John Doe matter. The parties dispute whether Investigator's disclosure of this file—and Doe's reaction to that disclosure—waived the protection of the work product doctrine. The Court holds that Doe's actions and inaction both before and after the February 11 meeting forfeited his claim that Investigator's file is protected work product or covered by the attorney-client privilege.

Unauthorized disclosure of privileged materials does not automatically constitute a waiver of privilege. (Gov't Mem. in Opp'n at 20.) But the privilege holder's actions before and after an unauthorized disclosure can result in the holder waiving a privilege. The privilege holder—here John Doe— bears the burden of showing that he did not waive work product protection. *See SEC v. NIR Grp., LLC*, 283 F.R.D. 127, 132 (E.D.N.Y. 2012); *Koch v. Greenberg*, No. 07 Civ. 9600, 2012 WL 1449186, at *7 (S.D.N.Y. Apr. 13, 2012); *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 105 (S.D.N.Y. 2007).

In cases of inadvertent disclosure (for example, mistakenly including protected documents in a voluntary and authorized production of nonprivileged materials), courts weigh four factors to determine if that disclosure constitutes a waiver. The four factors are: "(1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure at issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the overarching issue of fairness." *United States v. Rigas*, 281 F. Supp. 2d 733, 738 (S.D.N.Y. 2003). Factors one and three have also been codified in Rule 502(b) of the Federal Rules of Evidence.

This Court concludes that these four factors should also be applied in cases of unauthorized—as opposed to inadvertent—disclosure. *See United States v. Hatfield*, No. 06 Cr. 55, 2010 WL 183522, at *9 (E.D.N.Y. Jan. 8, 2010). The Court also notes that in cases of unauthorized disclosure, courts especially focus on the privilege-holder's actions after learning of the unauthorized disclosure. *See Koch*, 2012 WL 1449186, at *7.

### 1.  *Precautions taken prior to disclosure*

Lawyer testified that he instructed Investigator that "she was not to discuss [the case] with anybody, she's not to convey information to anybody." (Hr'g Tr. 47:16–17.) Investigator also testified that she was aware that she was unauthorized to disclose protected information to the government. (*Id.* 76:2–8.) Investigator may have understood the nature of privilege in the abstract, but her testimony belied her fundamental misunderstanding of what privilege requires of an attorney and an attorney's agents. Investigator repeatedly stated that she turned over confidential and privileged information in order to protect herself and Lawyer from a perceived threat of liability. (*Id.* 72:2–7, 73:17–74:4, 75:3–24, 115:8–18, 128:9–20, 156:18–157:6.) But taking the privilege seriously means respecting it, even if doing so means opening oneself up to potential

liability. *See People v. Belge*, 83 Misc. 2d 186 (N.Y. Cty. Ct. 1975), *aff'd*, 50 A.D.2d 1088 (4th Dep't 1975).

More consequentially, though, there was absolutely no evidence that Doe or his agents took any steps to protect Investigator's file after she stopped working on the Doe matter. Neither Investigator nor Lawyer testified that she was instructed to turn over her file along with any copies. Indeed, Doe knew that Investigator still retained a copy of the file a year later, when Doe's sister was sent to retrieve some or all of that file from Investigator. The Court credits Investigator's testimony that she provided Doe's sister with just two pages of follow-up materials, and not her entire file. (Hr'g Tr. 166:12–19.) But this fact only reinforces Doe's failure to take effective steps prior to protect work product prior to February 2013. In sum, the record does not demonstrate that John Doe, either personally or through his agents, took meaningful precautions to prevent Investigator's work product from being disclosed.

### 2.   *Volume of disclosure*

Courts are generally hesitant to find waiver if the inadvertently disclosed documents are few in number and part of a much larger production. *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, No. 09 Civ. 9783, 2013 WL 2322678, at *6 (S.D.N.Y. May 21, 2013). Here, by contrast, the entirety of Investigator's file was presumptively protected by work product. Indeed, Doe's attorneys did not specify which portions of that file were not protected until the third day of the fact-finding hearing, nearly six months after the February 11 meeting. Thus, this factor weighs in favor of finding a waiver.

### 3.   *Post-disclosure actions*

Above all, it is Doe's inaction following Investigator's disclosure that waives the protection covering Investigator's file. Investigator informed Lawyer about her meeting with the government and her disclosure of the file on the day after the meeting. (Hr'g Tr. 149:9–12; Def. Ex. B1 ¶ 8.)

Lawyer affirmed that he was "stunned" to learn of Investigator's disclosures. (Def. Ex. B1 ¶ 8.) He also affirmed that "[i]t is impossible to overstate the harm to [John Doe's] defense this incursion into privileged attorney-client communications and attorney work product has caused and/or will cause." (*Id.* ¶ 10.) Despite his shock on February 12, Lawyer waited over two weeks, until March 1, 2013, before contacting the government about this meeting. (Hr'g Tr. 201:6–15.) And after Doe's agreement with the government fell apart in early May 2013, Doe's attorneys waited several weeks before filing the instant motion to quash. (AUSA Decl. ¶ 7.)

These delays are unacceptable given the perceived gravity of Investigator's disclosures. Courts have held that twelve days, even six days, are too long to wait to avoid waiving privilege. *See Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater N.Y.*, No. 07 Civ. 1471, 2009 WL 393644, at *3 (E.D.N.Y. Feb. 13, 2009); *S.E.C. v. Cassano*, 189 F.R.D. 83, 86 (S.D.N.Y. 1999). And John Doe's attorneys displayed this dilettantish attitude towards the privilege twice. Doe was not required to file a motion in the first instance—an agreement with the government is sufficient to protect privileged materials. *See United States v. Stewart*, 287 F. Supp. 2d 461, 463–64 (S.D.N.Y. 2003). Once that agreement fell apart, however, Doe's second three-week delay merely compounded his first failure to act promptly.

### 4.   Fairness

Fairness considerations do not militate in favor or against waiver. John Doe has not asserted that Investigator's file—as opposed to other communications the Investigator revealed to the government—contains key information for Doe's possible defense against criminal charges. *See Stewart*, 287 F. Supp. 2d at 469. Although Doe now seeks to use Investigator's disclosure to disqualify the prosecution team, that team has always been on notice that Investigator's file was potentially covered by the work product doctrine. Even if Investigator were Doe's agent, and not

Lawyer's, her written materials prepared in anticipation of litigation constitute at least prima facie work product. *See* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . .").

Even without considering fairness, however, Doe's actions and inaction constitute a waiver of work product protection over Investigator's file.[4]

## III. CONCLUSION

For the reasons set forth above, John Doe's motion to quash is granted in part. The government may not inquire into communications between Doe and Investigator, except for any communications concerning the April and May 2011 meetings involving Jane Roe. The government may make use of Investigator's file.

Dated:  New York, New York
        June 24, 2014

SO ORDERED:

Sidney H. Stein, U.S.D.J.

---

[4] The Court, however, does not find a broader waiver reaching communications that Investigator may have spoken about with the government agents.